**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

UNITED STATES OF AMERICA

vs.

CASE NO. 3:10-cr-156-J-34TEM

PAUL MATTHEW SCHMITZ

_____/

## REPORT AND RECOMMENDATION[1]

This matter is before the undersigned on Defendant's Motion to Suppress Physical

Evidence Obtained From a Search of his Residence (Doc. #21, Motion), the United States'

response in opposition thereto (Doc. #26), and the parties' supplemental memorandums

(Docs. #32 and #34).[2]  A hearing was held before the undersigned on July 27, 2010 (Doc.

#27, Minutes).  A transcript of the proceeding has been filed (Doc. #30, hereinafter referred

to as "Tr." followed by the appropriate page number).   Based on the testimony and

evidence presented at the hearing, and for the reasons stated herein, the undersigned

recommends that Defendant's Motion (Doc. #21) be **DENIED**.

### I. Background Facts

On June 16, 2010, a grand jury returned a single-count indictment charging Paul

Matthew Schmitz ("Defendant") as a convicted felon in possession of a firearm under 18

_____

[1]Any party may file and serve specific, written objections hereto within FOURTEEN (14) DAYS
after service of this Report and Recommendation.  Failure to file a timely objection waives a party's right to
review.  *See* 28 U.S.C. § 636; Fed. R. Crim. P. 59; Local Rule 6.02, United States District Court for the
Middle District of Florida.

[2]The parties' supplemental memorandums were filed on August 23, 2010 and August 29, 2010,
respectively.

U.S.C. §§ 922(g)(1) and 924(a)(2) (Doc. #1).  Defendant was indicted by the grand jury after his arrest by members of the Columbia County Sheriff's Office.

More particularly, on March 23, 2010, at approximately 10:16 a.m., Deputy Sands of the Columbia County Sheriff's Office arrived at 472 NW Rebel Place, Lake City, Florida, in response to a 911 call regarding an alleged assault (Tr. 9-11; Doc. #34-1).  Upon arriving at the scene, Deputy Sands met with the complainant, Alan Bell, who reported that there had been an altercation between himself and his neighbor, Defendant (Tr. 11; *see* Tr. 59).  Mr. Bell reported to Deputy Sands that Defendant, while standing on his back porch, threatened to kill him, and that Defendant acted as though he was concealing a firearm in the waistband of his pants (Tr. 29-31).

Deputy Sands testified that, after observing Mr. Bell's demeanor and speaking with him for approximately 15 minutes, Mr. Bell appeared to be credible and, in addition, seemed to have "a well-founded fear" that Defendant was prepared to do him harm (Tr. 59-60).  Mr. Bell also expressed to Deputy Sands his consternation regarding his perceived lack of police assistance with respect to previous calls he had made to the sheriff's office to report gun shots coming from Defendant's property (Tr. 32-33, 39).

Based on the information he obtained from Mr. Bell, Deputy Sands processed Defendant's name through police dispatch for a report (Tr. 11).  The information Deputy Sands received from police dispatch revealed Defendant had an outstanding felony warrant for violating the terms of his probation related to a conviction for possession of a firearm by a convicted felon (Tr. 11-12).[3]  Consequently, Deputy Sands decided to investigate

---

[3]Defendant has eight (8) felony convictions (*see* Doc. #1).

2

further by going to Defendant's residence (Tr. 12, 36).

Upon arriving at Defendant's residence at 458 NW Rebel Place, Deputy Sands noticed that the driveway gate was locked (Tr. 13).  As a result of the gate being locked, Deputy Sands jumped over the fence (Tr. 13).  Deputy Sands testified that he believed Defendant would be located at his residence, and that his first order of business was to secure Defendant because he could be armed and dangerous (Tr. 36-37).  In accordance therewith, Deputy Sands knocked on both the front and back doors of Defendant's residence—to no avail (Tr. 36).  At this point, Deputy Sands inquired of Defendant's other neighbor, Barbara Bowersox, as to whether she had seen Defendant (Tr. 37; Doc. #34-1 at 4).  Deputy Sands testified that Ms. Bowersox responded that the last time she had seen Defendant was the previous day, and that she also acted as if she and Defendant were not friends (Tr. 65, 80).  Deputy Sands testified that he specifically asked Ms. Bowersox if Defendant was in her residence and that she stated no "several times" (Tr. 65).

Deputy Sands then went back to Mr. Bell's residence and advised him of both the status of his search for Defendant and his conversation with Ms. Bowersox (Tr. 80).  Deputy Sands testified that Mr. Bell assured him that Defendant and Ms. Bowersox were indeed friends (Tr. 80).  Upon learning this information, Deputy Sands re-approached Ms. Bowersox (Tr. 80).  Deputy Sands also noticed that the fence that divided Ms. Bowersox's property from Defendant's property contained a gate allowing easy access between the properties (Tr. 80).  Pursuant to this second conversation with Ms. Bowersox, Deputy Sands learned that Ms. Bowersox had previously lied to him as she admitted that Defendant was inside her residence (Tr. 40; *see also* Doc. #34-1 at 4).  Ms. Bowersox then entered her residence and produced Defendant, who surrendered without incident (Tr. 78).

3

At some point during this time period, police dispatchers were able to contact Defendant's wife, Sarah Schmitz, and requested that she leave work and return home to assist in locating her husband (Tr. 137-39; Doc. #34-1 at 4).   Prior to her arrival on the scene, however, Defendant had already been taken into custody and transported to jail (Tr. 49).

Upon her arrival, Mrs. Schmitz was apparently tearful and "hysterical" (Tr. 141).  She initially parked her vehicle on the roadway and approached Deputy Sands (Tr. 49).[4]  Deputy Sands proceeded to advise Mrs. Schmitz that: (1) there had been an allegation by her neighbor, Mr. Bell, that her husband had assaulted him by threatening to kill him with what Mr. Bell believed to be a handgun; (2) her husband had an outstanding felony warrant for his arrest; and (3) her husband had been located, arrested, and taken to jail (Tr. 17, 49). Deputy Sands then asked Mrs. Schmitz if she would allow him to search her residence for the alleged handgun that may have been used in the assault (Tr. 49).   Deputy Sands testified that toward the end of his 10-15 minute conversation with Mrs. Schmitz, she had calmed down and ceased crying, although she did appear nervous (Tr. 17, 23, 49, 51).[5] Deputy Sands stated that Mrs. Schmitz repeatedly apologized to him by saying she was "sorry," and that he understood this to mean she was apologizing for his having to be there

---

[4]Mrs. Schmitz testified that she was directed by police dispatchers to park behind the police vehicles that were located outside her residence (Tr. 140).  The hearing testimony reveals there were somewhere between 6-10 police vehicles located on the roadway near Defendant's residence (Tr. 47-48, 140).  Of these vehicles, some were apparently unmarked police trucks and others were marked patrol units (Tr. 47-48, 140).

[5]It should be noted that Mrs. Schmitz refutes this testimony and maintains that she was hysterical throughout her entire 10-15 minute encounter with Deputy Sands, and that she was shaking so badly that she had difficulty signing the Permission to Search form (Tr. 141).

(Tr. 17, 48).[6]

Deputy Sands further testified that: (1) he treated Mrs. Schmitz politely; (2) he never raised his voice; (3) although he was wearing a standard police uniform with a belt that contained a firearm and taser, such items remained holstered; (4) he allowed her to use her cellular telephone to call family and friends; and (5) he never threatened to arrest her or made any promises not to arrest her if she would consent to a search of her home (Tr. 23-25, 50, 159).

After Mrs. Schmitz agreed to consent to a search of her residence, Deputy Sands asked Mrs. Schmitz if she would unlock the driveway gate and move her vehicle into the driveway of the residence, which she did (Tr. 141). Deputy Sands testified that, after Mrs. Schmitz unlocked the driveway gate, he and another officer also parked in the driveway of the residence; however, they parked beside Mrs. Schmitz's vehicle and did not block her vehicle in (Tr. 16, 25). Deputy Sands then presented to Mrs. Schmitz a Permission to Search Form, which he testified he read aloud to Mrs. Schmitz in its entirety (Tr. 19-20; *see* Doc. #26-1).[7] Deputy Sands testified he read aloud the portion of the form which provides:

> I understand I have the right to refuse this search. I am giving this written permission to said Officer(s) free and voluntarily, without any threats or promises having been made to me causing me to give this permission.

(Tr. 21; *see also* Doc. #26-1).

---

[6]Mrs. Schmitz testified that she apologized to Deputy Sands because, since she was hysterical and her hands were shaking "really bad," it took her a while to sign the form because she had to "use [her] left hand to steady [her] right hand to sign the form" (Tr. 144).

[7]At the hearing, Mrs. Schmitz expressly stated that neither Deputy Sands, nor the other officer present at the time, read to her the Permission to Search Form (Tr. 146). Upon further inquiry by the undersigned, however, Mrs. Schmitz stated, "I can't say for sure [whether the form was read aloud]. I'm not going to sit here and lie and say they didn't [read the form aloud] but I don't think they did, no, sir." (Tr. 160-61).

Deputy Sands testified that he asked Mrs. Schmitz if she understood what he read to her, and that she answered in the affirmative (Tr. 21).  At this point, both Deputy Sands and Mrs. Schmitz affixed their signatures to the Permission to Search Form (Tr. 21, 145; *see also* Doc. #26-1).  Upon entry into Defendant's home, Deputy Sands saw, in plain view, what appeared to him to be a handgun holster (Tr. 46, 69, 71).[8]  Deputy Sands additionally observed a safe with its door slightly ajar (Tr. 52).  Deputy Sands opened the safe door further and noticed it contained, *inter alia*, shotgun ammunition, a mason jar containing marijuana seeds, and a plastic bag which contained partially smoked marijuana cigarettes (Tr. 53, 79, 81).  Also located within the residence was a surveillance system with one of its several cameras fixed in a position to view only Mr. Bell's property (Tr. 63).  Deputy Sands took photographs of what he observed and the Multi-Jurisdictional Drug Task Force ("MJDTF") was contacted to continue the investigation due to the fact Deputy Sands had discovered evidence of drug possession and/or drug manufacture (Tr. 54, 175).[9]

Upon the arrival of MJDTF agents, it was decided that a search warrant should be obtained since there was a locked bunker, or storm shelter, located in the back yard of the residence that Mrs. Schmitz did not have access to (Tr. 79, 163-64).  Deputy Sands relayed what he discovered pursuant to his investigation, *supra*, to MJDTF officer, Mitchell Cline ("Officer Cline"), who submitted an affidavit in support of obtaining a search warrant (Tr. 54-

---

[8]It should be noted that the subject holster is made of black nylon, and that it was later determined to have been a holster used to secure a compressed-air BB pistol (Tr. 82); however, at the time Deputy Sands viewed the subject holster, he did not see a compressed-air cylinder in or around it (Tr. 84, 86-87). In addition, Deputy Sands testified that he did not pick the holster up or move it from where he initially observed it (Tr. 87).

[9]The undersigned would note that Sergeant Ryan Bunton of the Columbia County Multi-Jurisdictional Drug Task-Force testified that marijuana seeds typically have only one useful purpose, which is to propagate new marijuana plants (Tr. 167, 174).

6

55; *see also* Doc. #34-1, Search Warrant Affidavit).

The search warrant affidavit describes the residence to be searched, the items to be searched for (*i.e.*, evidence of drug possession and/or manufacture and any firearms), and it describes the nexus between the location to be searched and the alleged crimes involved (Doc. #34-1).  A Search Warrant was subsequently issued by a State of Florida Circuit Judge, the Honorable Julian E. Collins (Doc. #34-2).  The Search Warrant authorized law enforcement officers to search Defendant's home for the following:

> CANNABIS, U.S. CURRENCY, AND/OR PARAPHERNALIA RELATING TO THE USE, POSSESSION, MANUFACTURE, AND/OR DISTRIBUTION OF CANNABIS AND/OR POSSESSION OF FIREARMS AND AMMUNITION

(Doc. #34-2 at 2).  The Search Warrant provided that the aforementioned items were being sought as evidence of a violation of either "Fla. Stat. Sec. 893 OR Fla. Stat. Sec. 790," which were described as proscribing cannabis and the possession of a firearm by a convicted felon (Doc. #34-2 at 2).[10]  While executing the Search Warrant, law enforcement officers unearthed, *inter alia*, a compressed-air BB pistol and a shotgun that is the subject of the Indictment (*see* Doc. #1; *see also* Doc. #27, Government's Exhibit No. 5).

At the hearing, Defendant testified in support of the Motion (*see* Tr. 91-124). Defendant stated that he and Mr. Bell have had a long-standing feud, which was exacerbated on the day in question because Mr. Bell yelled some "obscenities" toward him (Tr. 99-100).  Consequently, Defendant told Mr. Bell that, if Mr. Bell did not cease yelling obscenities at him, he would "kick his ass" (Tr. 101).  Defendant testified that, in response, Mr. Bell invited Defendant to meet him out in the roadway for a fist-fight (Tr. 101).

---

[10]As will be discussed more comprehensively below, the search warrant affidavit did not specifically aver that Defendant was a convicted felon (*see* Doc. #34-1).

Defendant stated that he choose not to oblige Mr. Bell and that he neither threatened to kill Mr. Bell, nor acted as if he had a firearm concealed in his waistline (Tr. 101-02).  Defendant additionally testified that, even if he had made a threatening gesture toward his waistline, Mr. Bell would have been unable to see such a gesture because of a large, opaque privacy tarp that he previously erected in an effort to block Mr. Bell's view of his property (Tr. 102).[11]

Defendant stated that he went over to Ms. Bowersox's house directly after the incident because he was tired of dealing with Mr. Bell and wanted to get away from him (Tr. 101).  Defendant testified that he was at Ms. Bowersox's residence for approximately one hour (Tr. 111).  Defendant stated that, although he was aware that police officers were on his property, he did not come out of Ms. Bowersox's home because said police officers had "their guns drawn" and he "just do[esn't] approach police officers with their guns drawn" (Tr. 122).  Defendant further stated that, although he was aware of the fact he had violated his probation, he did not know there was a warrant for his arrest because he would occasionally check the Florida Division of Law Enforcement website "and nothing ever came up so I [Defendant] thought I fell between the cracks" (Tr. 111).

Mrs. Schmitz also testified in support of the Motion (Tr. 135-65).  Mrs. Schmitz testified that her consent to search her residence was involuntary because Deputy Sands told her upon her arrival that he needed to get into her house to look for a potential firearm

---

[11]Defendant, his wife, and his mother all testified that said opaque privacy tarp is approximately 8 feet high and 60 feet long, and that it runs from the corner of Defendant's house to the back-end of his property (Tr. 102, 108, 128-32, 151-5).  They each also testified that, if Defendant were standing on his back porch (*i.e.*, where the incident in question allegedly occurred), the subject tarp would obscure Defendant's body from about his mid-chest down; thus, it is claimed Mr. Bell would have been unable to see Defendant's waistline (Tr. 102, 108, 128-32, 151-56).

and that "as long as [she] cooperated everything would be fine and [she] would not go to jail" (Tr. 140).  Mrs. Schmitz further testified that throughout her entire encounter with Deputy Sands she was "crying," "hysterical," and "shaking like a leaf" (Tr. 141).  She stated that she "thought [she] had no choice" but to consent to a search of her residence because she feared going to jail (Tr. 143).  Mrs. Schmitz further stated that she repeatedly apologized to Deputy Sands because she had trouble signing the Permission to Search form due to the fact her hands were shaking and she had "to use [her] left hand to steady [her] right hand in order to sign the form" (Tr. 144).

Mrs. Schmitz testified that she never read the Permission to Search form and that neither Deputy Sands, nor the other officer present at the time, read the form to her (Tr. 146).  Upon further inquiry by the undersigned as to whether the Permission to Search form was read aloud to her, Mrs. Schmitz, however, stated: "I can't say for sure.  I'm not going to sit here and lie and say they [the police officers] didn't but I don't think they did, no, sir" (Tr. 161).  Mrs. Schmitz stated that she cares deeply for her husband of thirteen (13) years and that she does not want anything bad to happen to him (Tr. 160; *see also* Tr. 135).

## II. Discussion

Defendant makes three arguments in support of the motion to suppress the physical evidence obtained from a search of his residence.  These arguments will be addressed in turn by the undersigned.

### A.   Whether the Consent to Search Defendant's Home was the Product of Police Coercion

Defendant first argues that his wife's consent to search his residence was the product of coercion; thus, her consent was invalid and the fruits of the unconstitutional

search should be suppressed as evidence in this case (Doc. #34 at 10-15).   The undersigned is not persuaded for the reasons that follow.

Law enforcement officers may conduct a search without either a warrant or probable cause if an individual gives his or her consent and that consent is voluntary.   *See Schneckloth v. Bustamante*, 412 U.S. 218, 222 (1973); *see also United States v. Street*, 472 F.3d 1298 (11th Cir. 2006); *United States v. Butler*, 102 F.3d 1191 (11th Cir. 1997).   For a warrantless search of a premises to be constitutionally valid on the basis of consent, such consent must be given voluntarily by an individual possessing "common authority" over the premises.   *Bates v. Harvey*, 518 F.3d 1233, 1244 (11th Cir. 2008) (*citing Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990)).   Common authority "rests . . . on mutual use of the property by persons generally having joint access or control for most purposes," and is not implicated by a mere property interest alone.   *Bates*, 518 F.3d at 1244 (*quoting United States v. Matlock*, 415 U.S. 164, 172 n.7 (1974)).   Consent is voluntary when it is the product of an essentially free and unconstrained choice.   *Bates*, 518 F.3d at 1244 (*quotation marks and citations omitted*).

Whether an individual's consent to a warrantless search was given voluntarily is a question of fact that must be decided in light of the totality of the circumstances.   *United States v. Purcell*, 236 F.3d 1274 (11th Cir. 2001).   As the Court's voluntariness determination is a factual one that usually turns on credibility choices from conflicting testimony, the appellate court will not disturb the lower court's judgment unless shown to be clearly erroneous.   *United States v. Barbour*, 70 F.3d 580 (11th Cir. 1995).

In this instance, the Court does not find Mrs. Schmitz's testimony that her consent was not voluntary to be credible.

10

As is evident from the testimony presented at the hearing, Deputy Sands and Mrs. Schmitz gave very different accounts of the events surrounding her signing the Permission to Search form on the day in question.  For instance, as noted above, Deputy Sands maintains that by the time Mrs. Schmitz signed the Permission to Search form she had calmed down and ceased crying (Tr. 17, 23, 49).  Deputy Sands testified that: (1) he treated Mrs. Schmitz politely; (2) he never raised his voice; (3) although he was wearing a standard police uniform with a belt that contained a firearm and taser, such items remained holstered; (4) he allowed her to use her cellular telephone to call family and friends; and (5) he never threatened to arrest her (Tr. 23-25, 50, 159).  Deputy Sands testified that he read the entire Permission to Search form to Mrs. Schmitz', which included the following paragraph:

> I understand I have the right to refuse this search. I am giving this written permission to said Officer(s) free and voluntarily, without any threats or promises having been made to me causing me to give this permission.

(Tr. 21; *see also* Doc. #26-1).  Deputy Sands stated that Mrs. Schmitz signed the form voluntarily, and that her signature was not the product of any coercion (Tr. 21-25, 50).

Mrs. Schmitz, however, testified that her consent was not voluntarily, as she was threatened with arrest if she did not consent to the search of her residence (Tr. 140-43).

When confronted with conflicting testimony, the finder of fact must weigh the credibility of the witnesses.  When determining the credibility of a witness, the finder of fact should consider certain factors.  For instance: (1) did the witness impress as one who was telling the truth; (2) did the witness have any particular reason not to tell the truth; (3) did the witness have a personal interest in the outcome of the case; (4) did the witness seem to have a good memory; (5) did the witness have the opportunity and ability to observe

11

accurately the things he or she testified about; (6) did the witness appear to understand the questions clearly and answer them directly; and (7) did the witness's testimony differ from other testimony or other evidence.  *See* ELEVENTH CIR. PATTERN JURY INSTR. No. 5 (*Criminal Cases*) (2003).

Here, Mrs. Schmitz's testimony that her consent to search her residence was not the product of her own free will is not convincing.  Mrs. Schmitz's testimony showed she does not recall the events in question with precision.  For instance, whereas Deputy Sands stated he is positive he read Mrs. Schmitz the Permission to Search form, Mrs. Schmitz testified in response to further questioning that she "can't say for sure" whether Deputy Sands read the subject form to her (Tr. 160).  Additionally, Mrs. Schmitz wavered in her testimony regarding the same upon further inquiry by the undersigned (*see* Tr. 160-61).

More particularly, initially Mrs. Schmitz's unequivocally testified that no police officer ever read the Permission to Search form aloud to her; however, she later stated she was not sure and the she did not "think they did" (Tr. 146).  Moreover, the inference from her testimony is that she was not completely forthright when she previously stated unequivocally that the form was not read aloud to her—as she sated, "I'm not going to sit here and lie and say they didn't [read the form aloud] but I don't think they did" (Tr. 161). Furthermore, Mrs. Schmitz has an interest in the outcome of the case since she cares deeply for Defendant and does not wish to see him go to prison (*see* Tr. 160).  For these reasons, the undersigned finds Deputy Sands' testimony credible, and finds no reason to discredit Deputy Sands' testimony based on Mrs. Schmitz's testimony.

In further support of his contention that Mrs. Schmitz's consent to search her home was coerced, Defendant argues:

> Deputy Sands never clearly disputed that he had told Ms. [sic] Schmitz that as long as she cooperated everything would be fine and as long as she cooperated she would not go to jail.  Instead, Deputy Sands made conclusory statements that he sought consent to search, that he made no threat to arrest her, and that Ms. [sic] Schmitz gave consent.

(Doc. #34 at 13) (*emphasis and internal citations omitted*).

Deputy Sands, however, does dispute that he threatened to arrest Mrs. Schmitz if she did not allow him to search her home (*see* Tr. 23).  Upon being asked by counsel for the United States, "Did you ever threaten to arrest her [Mrs. Schmitz]?" Deputy Sands responded "No."  In response to further questioning by the government, Deputy Sands stated: "No, ma'am.  I never threatened to arrest her [Mrs. Schmitz] the whole time I was there" (Tr. 23-24).  When asked if he ever made any promises to Mrs. Schmitz, Deputy Sands responded in the negative (Tr. 24).

Upon being questioned by defense counsel, and in direct response to being asked whether he told Mrs. Schmitz not to worry and that she would not be arrested if she cooperated, Deputy Sands stated "No, sir" (Tr. 50).  Moreover, when asked if the possibility of Mrs. Schmitz being arrested ever came up, Deputy Sands responded "No, sir." (Tr. 50).

Based on the foregoing, the undersigned finds Deputy Sands did clearly dispute Mrs. Schmitz's assertion that he conditioned her not being arrested on consent to search her home.

As an additional basis for asserting Deputy Sands' testimony cannot be relied upon, Defendant states:

> The evidence [at the hearing] clearly demonstrated that Deputy Sands either knowingly allowed false information to be presented in a search warrant affidavit or that he exhibited a reckless disregard for the truth by telling the task force officer who was gathering facts for a search warrant affidavit [*i.e.*, Officer Cline] that the defendant had threatened [Mr.] Bell **with a firearm**.

> Indeed, the evidence showed that Deputy Sands stood on the backporch [sic] of the Schmitz home exactly where the defendant stood and it would be obvious to any honest law enforcement officer that the complainant, Bell, was lying about having seen the defendant reach for a gun because Bell physically could not have seen the defendant gesturing to the defendant's waistline through the eight-foot opaque tarp that block the view between the defendant and Bell.

(Doc. #34 at 13-14) (*emphasis in original omitted; supplemental emphasis added*).

As an initial matter, the search warrant affidavit (Doc. #34-1) does not state that Defendant threatened Mr. Bell with a firearm.  The search warrant affidavit provides as follows:  The victim [Mr. Bell] advised [Deputy Sands] that during the verbal altercation [Defendant] Schmitz **acted as if he was concealing a handgun** in the waist line of his pants.  The victim [Mr. Bell] advised that this left him feeling threatened. . . ." (Doc. #34-1 at 3) (*emphasis added*).

The undersigned is not convinced that Deputy Sands either knowingly allowed false information to be put in a search warrant affidavit, or acted with reckless disregard for the truth, by telling the task force officer who was gathering facts for the search warrant affidavit that Defendant "threatened [Mr.] Bell with a firearm" (Doc. #34 at 13-14).  The search warrant affidavit in question speaks for itself, and it does not state that Mr. Bell was threatened with a firearm—rather, as noted above, the affidavit provides that Mr. Bell reported Defendant acted as if he was concealing a handgun in the waistline of his pants (*see* Doc. #34-1 at 3).

With respect to Defendant's contention that it would be "obvious to any honest law enforcement officer" that Mr. Bell was lying about having seen Defendant gesture toward his waistline because it would have been impossible for Mr. Bell to see Defendant's waistline through the opaque tarp, the undersigned is not convinced that Deputy Sands was

14

somehow derelict in his duties by not actually determining whether this would indeed have been the case given the circumstances presented.

To illustrate, during the time-frame in question, Deputy Sands was aware of the following: (1) he was responding to a 911 emergency call that reported an assault with a firearm; (2) when he arrived at the scene, the victim described what he witnessed and, although the victim acknowledged he did not actually see a firearm, the victim appeared to be in genuine fear that he had been threatened by such; (3) the victim advised Deputy Sands that he was not pleased with the way prior incident reports had been handled by the police with respect to his previous reporting of shots fired from the suspect's property; (4) that the suspect was not present at the scene; and (5) when inquiring about the suspect *via* police dispatchers, Deputy Sands was informed that the suspect had an outstanding felony arrest warrant for violating the terms of his probation related to a conviction for possession of a firearm by a convicted felon (Tr. 11-12, 59-60).

When Deputy Sands went to Defendant's property to search for him, it was believed Defendant was within his residence (Tr. 36). Deputy Sands apparently first knocked on Defendant's front door and announced himself; however, there was no response (Tr. 36). Deputy Sands then proceeded to Defendant's back porch and, although he did notice an opaque tarp, he was more focused on Defendant's back door since he was searching for an individual who: (1) was a convicted felon; (2) had an outstanding felony warrant for his arrest for violating the terms of his probation related to a conviction for possession of a firearm by a convicted felon; (3) may have just threatened to kill his neighbor with a handgun; and (4) was not answering his door or otherwise presenting himself to law enforcement (Tr. 35-38).

15

While it is conceivable that Deputy Sands, upon noticing a the subject tarp obscuring a portion of the view from Defendant's porch area, may have had a means by which to question the veracity of the victim's statements, the Supreme Court has indicated that, generally, it is improper for a court to second-guess the field decision(s) of a police officer.

> A creative judge [or defense counsel] engaged in *post hoc* evaluation of police conduct can almost always imagine some alternative means by which the objectives of the police might have been accomplished.  But the fact that the protection of the public might, in the abstract, have been accomplished by less intrusive means does not, itself, render [police conduct] unreasonable.  The question is not simply whether some other alternative was available, but whether the police acted unreasonably in failing to recognize or to pursue it.

*United States v. Sharpe*,  470 U.S. 675, 686-87 (1985) (*internal quotations and citations omitted*).[12] *Terry v. Ohio*, wisely instructs that "it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties."  392 U.S. 1, 23 (1968).  Such is the case here.

In sum, it would be unreasonable for the undersigned to find Deputy Sands was required to cease searching for Defendant (who had an active warrant for his arrest and who may have been armed and dangerous) simply because he noticed a privacy tarp that, in retrospect, may have obstructed the victim's view of Defendant's waistline.

Based on the foregoing, the undersigned does not find it would be "obvious to any honest law enforcement officer that the complainant, [Mr.] Bell was lying" about believing he had seen Defendant gesture toward his waistline, especially in light of the fact Officer Sands was (as he should have been) more focused on securing a wanted and potentially

---

[12]Although the "police conduct" that was at issue in *United States v. Sharpe* involved a pat-down search of a defendant, the undersigned finds the same reasoning referenced in the quotation, *supra*, applies to Officer Sands' investigative procedures in this instance.

dangerous suspect than contemplating whether the victim could have actually seen the suspect's waistline given his vantage point.  Accordingly, Defendant's contention(s) in this regard do not detract from Deputy Sands' credibility.

In conclusion, the undersigned finds Mrs. Schmitz was not threatened with arrest by Deputy Sands and that her consent to the search of her residence was not the product of police coercion.

### B.    Whether the Search Warrant is Deficient on its Face

Defendant next argues that the search warrant issued for the purpose of searching his residence at 458 NW Rebel Place, Lake City, Florida, is deficient on its face as it fails to establish probable cause that the presence of a firearm would evidence a violation of the Statutes of Florida (Doc. #34 at 15-19).

It is axiomatic that an individual in this country should not be subjected to an illegal search or seizure.  The Fourth Amendment states:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.  As no warrant shall issue except upon a finding of probable cause, probable cause is a procedural safeguard, which may be described as the probability of a fact being more likely than not.  The Supreme Court has stated "only the probability, and not a *prima facie* showing, of criminal activity is the standard of probable cause."  *Spinelli v. United States,* 393 U.S. 410, 419 (1969) (*abrogated on other grounds by Illinois v. Gates,* 462 U.S. 213 (1983)).

17

Probable cause may be determined by circumstances rather than direct evidence. *See United States v. Ventresca*, 380 U.S. 102, 107-08 (1965).  "In dealing with probable cause, . . . as the very name implies, we deal with probabilities.  These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act."  *Brinegar v. United States*, 338 U.S. 160, 175 (1949).  The Court held in *Ventresca, supra*, 380 U.S. at 108, that:

> affidavits for search warrants . . . must be tested and interpreted by magistrates and courts in a commonsense and realistic fashion.  They are normally drafted by nonlawyers in the midst and haste of a criminal investigation.  Technical requirements of elaborate specificity once exacted under common law pleadings have no proper place in the area.  A grudging or negative attitude by reviewing courts toward warrants will tend to discourage police officers from submitting their evidence to a judicial officer before acting.

The *Ventresca* Court continued on to state that where the underlying circumstances are detailed and a magistrate has found probable cause, "the courts should not invalidate the warrant by interpreting the affidavit in a hypertechnical, rather than a commonsense, manner."  *Id.* at 109.

In determining probable cause, the totality of the circumstances should be considered.  *Gates,* 462 U.S. at 230-33*; Massachusetts v. Upton*, 466 U.S. 727 (1984).  The *Gates* Court, *supra*, noted: "probable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules.  Informants' tips doubtless come in many shapes and sizes from many different types of persons."  *Gates,* 462 U.S. at 232.

In this case, a circuit court judge for the State of Florida determined probable cause existed to support the search warrant requested by Officer Cline to authorize the search

of Defendant's residence for both cannabis and firearms (*see* Doc. #34-2).[13]   The

Honorable Julian E. Collins issued the search warrant for Defendant's residence.  Judge

Collins' determination of probable cause should be given great deference by a reviewing

court.  *Gates*, 462 U.S. at 236.

When presented with the request for a search warrant, Judge Collins was faced with

an affiant ,Officer Cline, who had first hand knowledge of some of the events in question

that occurred that same day.

Officer Cline presented Judge Collins with evidence that Defendant: (1) was

suspected of committing aggravated assault with a deadly weapon (which is a felony in the

State of Florida); (2) had an active warrant for his arrest; and (3) had, in his home, a belt

of shotgun ammunition, an empty handgun holster, and cannabis (*see* Doc. #34-1).  The

suspicion concerning the handgun was raised by a victim/neighbor, Mr. Bell, who had a

face to face encounter with Defendant that led to a 911 call and a statement that Defendant

had threatened to kill him.

When considering the veracity of an informant, the court must consider the totality

of the circumstances under which the information came to be given to law enforcement.

*Gates*, 462 U.S. at 233.  In *United States v. Johnson*, 713 F.2d 654 (11th Cir. 1983), the

court acknowledged there may be no need to establish the reliability of information received

from the victim of a crime.  *Id.* at 660.  In *Johnson*, the facts upon which the probable cause

determination for a search warrant was predicated came from a kidnaping victim.  *See id.*

While such an extreme circumstance is not present in the instant case, the informant/victim

---

[13]It should be noted that Defendant failed to address the fact that, in addition to firearms, the
search warrant provided for a search for cannabis (*see* Doc. #34 at 15-19).

here reacted to what he perceived to be a felonious threat against his person by calling the police to his aid.[14]

As early as 1972, courts have accepted information provided to law enforcement by persons who are victim/witnesses or bystander/witnesses under relaxed credibility standards.  *See United States v. Bell*, 457 F.2d 1231, 1238-39 (5th Cir. 1972), *appeal after remand*, 470 F.2d 1178 (5th Cir. 1972) (appeal relating only to defendant's sentence).[15]  The *Bell* court held that search warrant affidavits need not attest to the credibility of informants who witnessed, or were victims of, a crime.  *Id.*

Under the present totality of the circumstances test, the Court sees no reason to deviate from *Bell*.  An alleged victim of a crime, Mr. Bell, reported feeling threatened by Defendant's behavior and reported his belief that Defendant may have been concealing a handgun during the altercation between the two.  As noted above, Deputy Sands had an opportunity to question Mr. Bell and observe his demeanor.  Deputy Sands testified that he believed Mr. Bell's assertions and determined Mr. Bell's appeared to have a "well-founded fear" (Tr. 59-60).  Consequently, on the facts presented to this Court, the undersigned finds it was reasonable for Deputy Sands to accept Mr. Bell's assertions—especially after discovering Defendant had an outstanding felony warrant for his arrest for violating the terms of his probation related to a conviction for possession of a firearm by a convicted felon, and after viewing an empty handgun holster in Defendant's residence.

---

[14]Aggravated assault with a deadly weapon is a felony in the State of Florida.  *See* Fla. Stat. § 784.021.

[15]In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*) the Eleventh Circuit adopted as binding precedent all the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

While the Affidavit did not specifically state that Defendant is a convicted felon, there is a strong inference of this fact.  More particularly, the Affidavit provides as follows:

> Upon arrival Sgt. Bunton and I [Officer Cline] who are members of the Drug Task Force began to gather information from the involved parties.  Upon arrival we spoke with Barbara Bowersox and David Myers who resides at 432 NW Rebel Place.  During this conversation **we learned that Myers was <u>also</u> a convicted felon**.  We began to question Bowersox and Myers on the possibilities of Schmitz [Defendant] hiding a firearm inside their residence at 432 NW Rebel Place.

(Doc. #34-1 at 4) (*emphasis added*).  Although the undersigned does not suggest that the aforementioned inference, standing alone, would provide sufficient probable cause for the issuance of a search warrant for firearms being in the possession of a convicted felon, the Affidavit set forth other factors that, when taken as a whole, provided probable cause for the issuance of the search warrant in question.

Although Defendant correctly notes that an affidavit would be facially deficient if it failed to establish probable cause, the facts set forth in the Affidavit, *supra*, are adequate for a detached judicial officer to reasonably conclude that evidence of a crime or contraband would probably be found within the premises to be searched.  *See United States v. Martin*, 297 F.3d 1308, 1314 (11th Cir. 2002) ("affidavit should establish a connection between the defendant and the residence to be searched and a link between the residence and any criminal activity").

Considering the totality of the circumstances, the Affidavit was sufficient to establish probable cause—as it set forth the link between Defendant, his home, and probable illegal activity.  *See United States v. Anderson*, 152 Fed. App'x 915, 917 (11th Cir. 2005).[16]  The

---

[16]Unpublished opinions are not considered binding authority; however, they may be cited as persuasive authority pursuant to the Eleventh Circuit Rules.  11th Cir. R. 36-2.

search warrant affidavit provides that: (1) Defendant resides at the residence to be searched; (2) Defendant may have made a threat to kill his neighbor; (3) while making the alleged threat, Defendant may have acted as though he had a handgun concealed within his waistband; and (4) an empty handgun holster was located in the residence during a consent search (Doc. #34-1). Consequently, the undersigned finds the Affidavit sets forth sufficient facts to establish that a search of Defendant's residence could unearth evidence of a handgun having been used during the alleged assault (*see* Doc. #34-1). The search warrant affidavit also provides a nexus for the search for drugs and drug paraphernalia (*see* Doc. #34-1).

Even assuming *arguendo* that the Court were to find the search warrant in question lacked probable cause for the search of firearm(s) since the Affidavit did not specifically allege that Defendant is a convicted felon, the undersigned finds two exceptions to the exclusionary rule would apply in this instance. Those exceptions are: (1) the "good faith" exception; and (2) the "plain view" doctrine.

### 1. The Good Faith Exception to the Exclusionary Rule

The good faith exception to the exclusionary rule applies when law enforcement officers reasonably, and in good faith, rely on a facially valid search warrant, issued by a neutral and detached judicial officer, that is later determined to be invalid. *United States v. Leon*, 468 U.S. 897 (1984). The test for reasonable police conduct is objective. *United States v. Herring*, 492 F.3d 1212, 1218 (11th Cir. 2007) (*citing Leon*, 468 U.S. at 919 n.20). "When officers engage in 'objectively reasonable law enforcement activity' and have acted in good faith when obtaining a search warrant from a judge or magistrate, the *Leon* good faith exception applies." *United States v. Martin*, 297 F.3d 1308, 1313 (11th Cir. 2002)

(*quoting Leon*, 468 U.S. at 919-20).  "Suppression is necessary 'only if the officers were dishonest or reckless in preparing their affidavit or could not have harbored an objectively reasonable belief in the existence of probable cause.'" *United States v. Robinson*, 336 F.3d 1293, 1296 (11th Cir. 2003) (*quoting Martin*, 297 F.3d at 1313).

Defendant, however, maintains that two exceptions to the good faith doctrine apply here (Doc. #34 at 17-19).  Specifically, Defendant asserts: (1) the judicial officer's neutral and detached role was "wholly abandoned" by Judge Collins; and (2) the warrant was based on an affidavit that was so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable (Doc. #34 at 18-19).

In the first instance, the undersigned does not find Judge Collins' neutral and detached role was wholly abandoned.  As noted above, Judge Collins was faced with an affiant, Officer Cline, who had first hand knowledge of some of the events in question.  Officer Cline presented Judge Collins with evidence that Defendant, *inter alia*: (1) was suspected of committing aggravated assault with a deadly weapon; (2) had an active warrant for his arrest; and (3) had, in his home, a belt of shotgun ammunition, an empty handgun holster, and cannabis (*see* Doc. #34-1).  The Affidavit also contained a strong inference that Defendant was a convicted felon.  Based on the foregoing, the undersigned does not find the warrant was issued by a judicial officer who wholly abandoned the role of being neutral and detached.

In the second instance, Defendant maintains the police officer(s) who executed the warrant were unreasonable in their belief that it was based on probable cause because the Affidavit did not specifically state that Defendant is a convicted felon (Doc. #34 at 19).  This argument is without merit.  For instance, the officer who applied for the warrant did not

23

base the Affidavit on information that he knew was false.  Here, the officers involved in procuring the search warrant knew Defendant is a convicted felon.  As the *Leon* Court noted:

> References to 'officer' throughout this opinion [the *Leon* opinion] should not be read too narrowly.  It is necessary to consider the objective reasonableness, not only of the officers who eventually executed a warrant, but also of the officers who originally obtained it or who provided information material to the probable-cause determination.

468 U.S. at 923 n.24.

As a result, the undersigned does not find the officers involved in both procuring and executing the warrant acted unreasonably in their belief that it was supported by probable cause.  Therefore, such an exception to the *Leon* good faith doctrine does not apply in this instance.

Based on the foregoing, the undersigned finds the good faith exception to the exclusionary rule would apply to the facts of this case.

### 2.    The Plain View Doctrine

The "plain view" doctrine permits a warrantless seizure where: (1) an officer is lawfully located in the place from which the seized object could be plainly viewed and has a lawful right of access to the object itself; and (2) the incriminating character of the item is immediately apparent.  *Horton v. California*, 496 U.S. 128, 136-37 (1990); *United States v. Hromada*, 49 F.3d 685, 690 n.11 (11th Cir.1995); *United States v. Smith*, 459 F.3d 1276, 1290 (11th Cir. 2006).  For an item's incriminating character to be "immediately apparent," an officer merely needs probable cause to believe the item is contraband.  *Texas v. Brown*, 460 U.S. 730 (1983).   An example of the applicability of the plain view doctrine is "the situation in which the police have a warrant to search a given area for specified objects,

and in the course of the search come across some other article of incriminating character." *Horton*, 496 U.S. at 135 (*quoting Coolidge v. New Hampshire*, 403 U.S. 443, 465 (1971) (opinion of Stewart, J.) (*internal quotation marks omitted*).

Here, the undersigned finds that, even if the search warrant lacked the requisite probable cause to authorize a search for firearms, the police were lawfully at Defendant's residence to execute a search for cannabis.  As noted above, the warrant is supported by probable cause to believe evidence of drugs and drug paraphernalia would be located at Defendant's residence.  Although there was no testimony regarding exactly where in Defendant's residence the shotgun in question was located, the undersigned would note that drugs and drug paraphernalia can be stored in places smaller than where a shotgun can be stored.  "A search may be as extensive as reasonably required to locate the items described in the warrant."  *Smith*, 459 F.3d at 1291 (*internal quotations and citations omitted*).

With respect to the incriminating character of the shotgun being immediately apparent, the police in this instance had probable cause to believe the discovered shotgun was being kept by a convicted felon.  More particularly, the officers involved in procuring the search warrant knew Defendant is a convicted felon, and what is known as the "fellow officer rule" imputes the collective knowledge of police investigating a crime to each member, and each officer need not have independent personal knowledge. *See State v. Peterson*, 739 So.2d 561, 565 (Fla. 1999); *see also Alderman v. McDermott*, No. 6:03-cv-41-ACC, 2004 WL 1109541, at *6, n. 93 (M.D. Fla. Apr. 27, 2004).  The standard in this regard is objective.  *United States v. Clark*, 559 F.2d 420, 425 (5th Cir. 1977) ("the scope of the Fourth Amendment is not determined by the subjective conclusion of [a particular]

law enforcement officer") (*internal quotations and citations omitted*).

Based on the foregoing, the undersigned finds the plain view doctrine would apply to the discovery of the shotgun that is the subject of the Indictment.

**C.    Whether Probable Cause For Issuance of the Search Warrant Would Continue to Exists Once Assertions That are the Product of Mrs. Schmitz's Coerced Consent are Excluded from the Search Warrant Affidavit**

Defendant's final argument is based on the premise that Mrs. Schmitz's consent to the search of her home was the product of police coercion (Doc. #34 at 19-25).  In light of the fact the Court has determined Mrs. Schmitz's consent was not the product of police coercion, this argument is moot.

## III. Conclusion

After due consideration, and for the reasons stated herein, the undersigned hereby

**RECOMMENDS**:

Defendant's Motion to Suppress Physical Evidence Obtained From a Search of his Residence (Doc. #21) be **DENIED**.

**DONE AND ENTERED** at Jacksonville, Florida this 18th day of October, 2010.


Copies to all counsel of record

**THOMAS E. MORRIS**
United States Magistrate Judge